UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                    Plaintiff,                    Case No. 09-CR-254

          v.

LAMAR WALTON et al.,

                    Defendants.

## GOVERNMENT'S STATEMENT OF THE CASE

The Plaintiff, United States of America, by its attorneys, Michelle L. Jacobs, United States Attorney for the Eastern District of Wisconsin, and Brian J. Resler, Assistant United States Attorney for said district, hereby submits the following statement of the case. All 18 defendants in this case have been charged, in relation to their membership in and activities with the Westlawn and Six Trey street gangs, with Conspiracy to Distribute and Possess With Intent to Distribute 5 Kilograms or More of Cocaine, 50 Grams or More of Cocaine Base, and Marijuana, in violation of Title 21, United States Code, §§ 846, 841(a)(1) and (b)(1)(A), and Title 18, United States Code, Section 2, from approximately 1996 to October, 2008. In addition, other members face additional weapons or drug charges related to the conspiracy.

Although many defendants in this matter are already in state or federal custody, the government will seek detention against most if not all the remaining defendants. Upon conviction, the conspiracy count alone carries a minimum mandatory sentence of 120 months to life, and therefore there is a rebuttable presumption of detention pursuant to Title 18, United States Code, §3142(e)(3)(A). This summary of the case is submitted to aid the court and counsel in ascertaining

the weight of evidence against the defendants when considering factors relevant to detention or release pursuant to Title 18, United States Code, § 3142(g), as well as provide all defendants, regardless of custodial status, with an overview of the evidence in the case.

**BACKGROUND INFORMATION**

1.      The investigation to date has included: (1) historical testimony and statements of cooperating Six Trey and Westlawn leaders and members (cooperating informants or "CIs"), victims, and eyewitnesses; (2) interception of hundreds of calls from consensual Title III wire intercepts, (3) information from pen trap and trace devices, (4) electronic surveillance, (5) undercover recordings of conversations with Six Trey and Westlawn members, (6)  the undercover purchase of controlled substances from Westlawn members; (7) search warrants, (8) grand jury subpoenas, (9) consensually recorded telephone conversations, (10) reverse undercover operations for controlled substances, (11) recorded prison telephone calls; and (12) the recovery of ballistics and other physical evidence.  Due to the considerable volume of information available from this investigation, only a brief summary of all of the incriminating facts and circumstances surrounding these charges have been included in this submission.   In addition, due to the interconnected nature of these individuals and their activities, information relevant to many members is included throughout this document.

2.      Members of the Six Trey and Westlawn gangs operate in a 22 block area on the northwest side of the city of Milwaukee.  This area includes the Milwaukee Public Housing Authority's Westlawn Housing Projects, which contain 149 buildings with 726 family units placed in a three block area between North 60th Street to North 68th Street.

3.      In approximately 1989, the Westlawn street gang was formed by individuals residing in the Westlawn Housing Projects.  These members wanted to separate themselves from the older

2

Westworld (or Six Four Hustler) gang members who had influenced the projects up to that time. Gang leadership was not formerly established upon inception, the members were just attempting to identify themselves as a separate entity from the older gang members. Over time, leadership in the Westlawn gang was based upon the member's ability to obtain cocaine sources of supply, and the level of intelligence that the member possessed as it pertained to criminal activity. The individuals who controlled the flow of narcotics to other Westlawn members were in a position to control the violent criminal activities of the gang. This separated Westlawn members into two categories: members who served as drug suppliers and members who distributed the drugs and conducted acts of violence. As this criminal activity was beneficial to all members, they were brought together to assist in distribution or to conduct acts of violence. Westlawn leaders who emerged to control the activities of the gang included Michael Riley, Corey Winters, and Willie Mohomes.

4. In 1990, the Six Trey street gang, which was originally called the Courtyard gang, controlled a six block area on Milwaukee's north side. The leader of Six Trey was Rufus "Silk" Cassel, who had strong family ties to the Brothers of the Struggle Street Gang (BOS) which operated in three separate locations in Milwaukee. Through experience gained from BOS members, Cassel organized the Six Trey gang and led the members in numerous criminal endeavors which included drug trafficking, drug related shootings, and armed robberies. Cassel was extremely proficient in using violence to keep rival street gangs and law enforcement out of the Six Trey area of influence. Cassel also called upon his contacts with the BOS to assist in acts of violence when additional help was needed. The Six Trey leadership beneath Rufus Cassel included Lamar Walton and Vernell Bullock.

5. Individuals from both Westlawn and Six Trey associated with one another while

Case 2:09-cr-00254-CNC   Filed 10/19/09   Page 3 of 49   Document 2

growing up. However, when the gangs were established, the friendships were strained. At that time the Westlawn and Six Trey areas of influence were separated by two city blocks. Due to their close proximity, individuals from Westlawn went into the Six Trey area to conduct drug transactions and vice- versa. This resulted in violent acts directed against the gang that committed the infraction.

6.     In 1996, Rufus Cassel brought both gangs together to end the conflicts. Cassel was looked upon as the leader of both areas, and the end to hostilities allowed for controlled substances to flow to distribution houses and to other customers without the threat of robbery.

7.     Rufus Cassel was killed in a shooting incident months after assuming control of both areas and ending the fighting between the gangs. Lamar Walton then assumed Cassel's position and established drug trafficking agreements with the Westlawn members who were in leadership positions. These agreements were made to assist each other in the supply of cocaine, crack cocaine, or marijuana in order to meet demand. As a result, Lamar Walton, Michael Riley, and Corey Winters eventually distributed hundreds of kilograms of cocaine to Six Trey and Westlawn members as well as other customers throughout Milwaukee.

8.     In approximately 1996, Walton established an accord with other Westlawn members, including Michael Riley and Corey Winters, to not assist law enforcement personnel in building cases against one another. The arrested individual had to turn to individuals outside of Westlawn or Six Trey in order to obtain credit on a sentence. This agreement was eventually relayed to all gang members and was a rule that could not be broken. Individuals who adhere to the rule could continue to receive and distribute controlled substances, and conduct other criminal activity while appearing to assist law enforcement. Westlawn members would then assist the charged individual in obtaining credit towards a sentence by providing third hand information that could be portrayed

4

as first hand knowledge, or by placing firearms in specific locations that could be recovered by law enforcement. Individuals who violated the rule were targeted for criminal activity by their fellow gang members.

9.     After the death of Rufus Cassel, from 1996 until 1998, the activities of Six Trey members were specifically controlled by Vernell Bullock and another member. Through the threat of violence, Lamar Walton was able to maintain his influence over both gangs' areas. This control was enhanced with the cocaine procured by Westlawn leader Michael Riley. Michael Riley's cocaine shipments from 1997 until 1998 enabled the Westlawn and Six Trey gangs to distribute in excess of 200 kilograms of cocaine, which allowed the gangs to flourish.

10.     In the late 1990s several Westlawn and Six Trey members went to prison for drug trafficking and other violent offenses. In the early 2000s, the Six Trey members began to frequently operate in the Westlawn Housing Projects, and slowly moved off of North 63rd Street to the area previously dominated by the Westlawn gang. This resulted in Six Trey operating in the eastern half of the housing projects and Westlawn operating in the western half.

11.     As Westlawn and Six Trey members were released from prison, they reunited with their criminal associates. The influence over the activities of both gangs remained the same with Lamar Walton, Vernell Bullock, and others directing Six Trey, and Michael Riley, Corey Winters, and eventually Willie Mohomes directing Westlawn. From 2000 until 2008, these gangs continued to be supported by drug distributors, enforcers, facilitators, and individuals who could be directed to commit acts of violence for monetary gain.

12.     The Westlawn and Six Trey gangs do not have a rigid structure but are divided into leaders, distributors, and soldiers (who commit acts of violence as well as traffic in controlled substances). The gangs' leaders have the ability to procure money for the gangs through criminal

activity, and direct others in their respective gangs to distribute controlled substances or conspire with them to commit acts of violence that assist the gangs' operations, while the leaders have been able to separate themselves from physically participating in the violence conducted by junior members. The leaders have further been in a position to deter the efforts of law enforcement, and allow for the drug trafficking and associated violence to continue regardless of interruption due to prison sentences. The members of both gangs have their own associations with one another, and violence at the lower levels has occasionally occurred.

## ORGANIZATION STREET GANG AFFILATION

13. Tables I and II respectively identify the Westlawn and Six Trey gang members mentioned in this affidavit. Both tables are based on information provided by confidential informants, and do not include the entire membership of either of these gangs.

### Table I - Westlawn Gang Membership

| |
|---|
| Corey Winters |
| Michael Riley |
| Willie Mohomes |
| Elton Carter |
| Jeffrey Carter |
| Dawan Howard |
| Sam Lipsey |
| Franwan Mathis |
| Ian Reed |
| Aaron Seymore |

### Table II - Six Trey Gang Membership

| |
|---|
| Lamar Walton |
| Vernell Bullock |
| Undray Bradley |
| Kendall Burton |
| Rodney Davis |
| Durlyn Eddmonds |
| Jerry Greer |
| Jeffrey Jones |

**Lamar Walton**

14.     CI-1 advised case agents that CI-1 met Lamar Walton in approximately 1988.  At that time, Walton associated with Rufus Cassel, a.k.a., "Silk," and was distributing small amounts of marijuana, cocaine and crack cocaine in the area of N. 63rd St., an area controlled by the Courtyard street gang, but which later became known as the Six Trey street gang.  Over the next few years, Walton worked with Cassel, the leader of the Six Trey, in drug trafficking in the area and, through violence, keeping out rival groups, such as the Vice Lords and a Jamaican group, as well as individual traffickers.  By 1998, when CI-1 was released from prison, Cassel had been killed in a shooting, and Walton was running the Six Trey.  By 2001, Walton was receiving and distributing 5 kilograms or more of cocaine per week, and by 2002 or 2003, the amount had increased to 10 kilograms or more per week.  Walton would further receive cocaine from Michael Riley.  CI-1 added that whenever Walton would get into trouble with law enforcement, he would cooperate, but also continue to engage in drug trafficking.  CI-1 stated Walton has, over the years, supplied cocaine to Michael Riley, Corey Winters, Vernell Bullock, Ian Reed, Sam Lipsey, and others.

15.     CI-2 met Lamar Walton, a.k.a. "Peanut," in approximately 1994 or 1995.  At the time, CI-2's source of supply had run dry, so CI-2 purchased a half-ounce of cocaine from Walton, despite Walton's bad reputation for robbery.  In approximately 2000, CI-2 again turned to Walton for cocaine, and purchased nine ounces of cocaine for $6,000.  In 2001, Walton asked CI-2 for two kilograms of cocaine, and CI-2 delivered the cocaine to Walton for $46,000.  CI-2 saw Walton approximately five times per week from approximately 2002 to 2004, often selling cocaine.

16.     CI-3 met Lamar Walton in 1981 or 1983.  In the late 1980s to the early 1990s, Walton

began associating with Rufus Cassel, a respected member of the Brothers of the Struggle (BOS) street gang, though Walton was a member of Six Trey. Walton became Cassel's "right hand man," and would commit acts of violence on Cassel's orders. In 1996, in order to end the violence between Westlawn and Six Trey gang members, and to ensure a stable environment for drug trafficking, Cassel called a meeting to unite both groups. For a short time, Cassel led both gangs, and somewhat controlled the cocaine, crack cocaine, and marijuana distribution in the area of Westlawn. A few months later, however, Cassel was shot and killed. CI-3 stated that Walton immediately assumed Cassel's position, as Walton knew members of both Westlawn and Six Trey.

17. In July 1998, CI-3 began purchasing 4.5 ounces of cocaine, as 2.25 ounces of powder and 2.25 ounces of crack cocaine, from Walton four to five times per week. This amount increased to nine ounces of cocaine two to three times per week by October, 1998, and continued to April, 1999. By the summer of 2000, CI-3 received a half-kilogram of cocaine from Walton weekly until 2001, though CI-3 also purchased cocaine from Walton in 2002. CI-3 observed Walton in possession of firearms during almost every drug transaction.

18. CI-4 met Lamar Walton in approximately 1998, and soon learned that Walton was distributing cocaine. CI-4 observed Walton, who was very security-conscious, distribute approximately 4.5 kilograms of cocaine from 1998 to 2000. CI-4 was also present when Michael Riley called Corey Winters from prison, and heard Riley instruct members to change nicknames, switch cellular telephones, use rental cars, and use codes and text messages instead of talking on cellular telephones when drug trafficking to avoid detection. CI-4 stated that Corey Winters was in control of the Westlawn gang, and oversaw the gang's drug distribution and acts of violence.

19. CI-5 met Lamar Walton in 1993 through "Silk" (Rufus Cassel). By 1994 or 1995,

8

Walton associated with Michael Riley and Corey Winters. In approximately 1998, CI-5 purchased six ounces of cocaine from Walton for $2,200. Walton also contacted CI-5 on several occasions and offered the locations of homes to burglarize where drugs or money was hidden. CI-5 stated that Walton didn't participate in the robberies or burglaries, but just wanted money for the information. In 1998, CI-5 purchased 11 "8-balls" (3.5 gram quantities) of crack cocaine from Walton for $700 each. CI-5 further identified Vernell Bullock, a.k.a. "V-Dog," as Walton's "right hand man" who conducts a majority of Walton's drug transactions. CI-5 has further observed Walton with handguns on numerous occasions.

20. CI-6 met Lamar Walton in the summer of 1996. Walton attempted to recruit CI-6 to his "line," meaning getting CI-6 to purchase cocaine from Walton. CI-6 did not purchase from Walton, however, as Walton had the reputation of "jamming" people up and not caring what happened to them. CI-6 stated that Walton was known to have drug traffickers robbed of their cocaine and proceeds.

21. CI-9 further advised agents that CI-9 met Lamar Walton in 1998. CI-9 knew Walton was a drug trafficker, and that CI-9's relative supplied Walton with cocaine. CI-9 was present in Milwaukee on one occasion when CI-9's relative supplied one kilogram of cocaine to Walton.

22. On October 28, 2008, under the direction and control of case agents, CI-9 contacted Walton by cell phone and, in recorded conversations, arranged to supply Walton a kilogram of cocaine (actually a package prepared by the DEA to only appear contain cocaine). The phone calls between CI-9 and Walton were recorded. Walton met with CI-9, accepted the package, and was arrested. Walton himself then agreed to cooperate, and contacted Vernell Bullock by cell phone and, in recorded conversations, arranged a similar transaction. Bullock met with Walton, accepted the

9

package, and was also arrested. Both Walton and Bullock were charged with Attempted Possession With Intent to Distribute 500 Grams or More of Cocaine in case 08-CR-293 (CNC). Walton and Bullock were convicted and presently await sentencing.

23.     Additional information pertaining to Lamar Walton is contained in the following sections herein: *Background Information; Vernell Bullock; Corey Winters; Undre Bradley et al; Roderick Davis; Durlyn Eddmonds and Jerry Greer; and Ian Reed*.

**Vernell Bullock**

24.     CI-3 met Vernell Bullock in the late 1980s, when Bullock was "third in command" of the Six Trey. CI-3 stated that after Rufus Cassel's death, Bullock was second in charge behind Lamar Walton. CI-3 stated that Bullock was originally a "Breed," or Black Gangster member. Bullock also orchestrated acts of violence between Six Trey members and other gangs, and directed the drug distribution by lower members of the gang. CI-3 related that Bullock was very strict in this regard, and used violence to address any members deviating from his instructions. CI-3 stated that Bullock did this to ensure the uninterrupted distribution of cocaine. CI-3 first observed Bullock with drugs in 1992 or 1993, selling small amounts of marijuana. When Rufus Cassel or Lamar Walton obtained drugs through robbery, some of the drugs would be passed to Bullock for distribution from his apartments. Later on, Bullock let other members of Six Trey control the distribution from these units. CI-3 stated hat Bullock carried a firearm during drug transactions, and ensured that distributors working in his apartments were armed as well. CI-3 personally received kilograms of cocaine, as well as crack cocaine, marijuana, jewelry and firearms from Bullock from 1992 to 1998.

25.     CI-7 met Vernell Bullock when they both were kids in the area of N. 63rd St. and Kaul St. CI-7 described Bullock as a "fighter" and Bullock later became an "enforcer." When Bullock was

10

approximately 14 years old, Bullock was really "hustling" small amounts of cocaine, crack cocaine, and marijuana. When there were problems in the Six Trey area, Bullock was always on the "front lines" and would not hesitate to use a firearm. CI-7 recalled that in approximately 1995, Bullock was "calling the shots" on N. 63rd St. Rufus Cassel was still in charge of Six Trey, but Bullock was in charge of the drug distribution houses. When Cassel died, Bullock was in the Milwaukee House of Corrections, but upon his release, Bullock became "top dog" on N. 63rd Street with CI-7 and another member. Over the next few years, CI-7 observed Bullock distribute approximately one-half to one ounce of crack cocaine each day. All of the younger Six Trey members were directly under the control of Bullock, who would pass along his cocaine and marijuana for them to sell for him. CI-7 stated that Bullock was terrible with his money and would blow it on rental cars, hotel rooms, shopping, and would also misplace it.

26. In August 2006, Bullock was released from prison, and met CI-7 at CI-7's residence. CI-7 informed Bullock that "the streets were not the same," and Bullock agreed, and immediately began to bring N. 63rd St. back under his control and authority. Approximately one month later, CI-7 was introduced to "D-L" (Durlyn Eddmonds), and other new Six Trey members that Bullock had recruited. Bullock then began to pressure the other drug dealers in what was previously Six Trey area to fall into line under Bullock, regardless of their gang allegiance. CI-7 stated that there were some conflicts from these dealers, but Bullock had the dealers shot at or robbed into submission, and eventually every drug distributor in the Six Trey area followed Bullock's directions. CI-7 recalled observing Bullock in this time period in possession of 4.5 to 9 ounces of cocaine and approximately 3 to 4 pounds of marijuana. The controlled substances would be "fronted" to the workers and then the money would be returned to Bullock after the drug transactions. In addition, Bullock would have

11

the Six Trey members conduct drug transactions during the day, and armed robberies at night.

27.     As noted above, on October 28, 2008, Bullock was arrested with Lamar Walton after each separately accepted a kilogram of what they believed was cocaine. Both Bullock and Walton were charged with Attempted Possession With Intent to Distribute 500 Grams or More of Cocaine in case 08-CR-293 (CNC). Walton and Bullock were convicted and presently await sentencing.

28.     Additional information pertaining to Vernell Bullock is contained in the following sections herein: *Background Information; Lamar Walton; Corey Winters; Undre Bradley et al; Roderick Davis; Durlyn Eddmonds and Jerry Greer; and Ian Reed.*

### Corey Winters

29.     CI-1 met Corey Winters in approximately 1987 or 1988 through Michael Riley in the Six Trey area of N. 63rd and Kaul. CI-1 has known Riley since the 8th grade. Both Riley and Winters were living in the Westlawn housing projects, and were selling marijuana from Winters' residence. By 1991 to 1993, Winters and Riley were distributing cocaine and crack cocaine. In about 1993 to 1994, Riley received nine ounces to half-kilograms of cocaine and crack cocaine, which he would supply to Winters and other members of Westlawn. CI-1 added that by the spring of 1998, Riley and Winters received multiple kilograms of cocaine at a time from Riley's cousin in Chicago, typically getting 5 kilograms of cocaine twice a week. The cocaine was then supplied to Lamar Walton and others, who were part of an entire network of dealers throughout Westlawn and the surrounding areas. CI-1 stated that this arrangement continued through November, 2005. In approximately 2006, Winters was released from prison, and immediately went back to distributing cocaine, as he still had the Westlawn gang under his control.

30.     CI-2 met Corey Winters, a.k.a. "Fat Brains," in approximately 1994 or 1995. Winters

12

typically hung out with Michael Riley and others, and purchased one to two ounces of cocaine at a time, which Winters converted into crack cocaine and sold in "dime bag" ($10) quantities. Soon after they met, CI-2 and Winters began pooling their money to purchase larger quantities of cocaine for better prices, from 4.5 to 27 ounces at a time. As the years passed, CI-2 and Winters switched suppliers periodically, but Winters became a large-scale purchaser and distributor of cocaine. CI-2 was with Winters on a daily basis from 1994 until 1999 or 2000, when Winters was arrested. CI-2 stated that Winters was sometimes armed with a handgun when he distributed cocaine.

31. CI-3 met Corey Winters in approximately 1982 or 1983. By 1990 or 1991, CI-3 became aware that Winters distributed crack cocaine with Michael Riley, and estimated that Winters sold two to three $100 bags of crack cocaine "rocks" daily. Winters worked closely with Riley until approximately 1998, when Winters began selling his own large amounts of cocaine. CI-3 began regularly purchasing crack cocaine from Winters in quantities ranging from two to nine ounces weekly until the summer of 1999. At that time, Winters supplied CI-3 with a half-kilogram of powder or crack cocaine on consignment every two to three days. However, by late 1999 or early 2000, Winters and an associate were robbed of $78,000, and became unable to purchase more cocaine to supply CI-3 and others. A few months later, Winters was arrested and went to jail.

32. CI-5 met Corey Winters, a.k.a. "Fat Brains," in 1984 or 1985 when Winters was 8 to 10 years old. In about 1992, CI-5 was with Winters, Michael Riley and others when they were approached by another individual, who asked the group to come to his mother's residence near N. 63rd St. and Carmen. Once there, this person asked if the group wanted to "hustle" (sell crack cocaine) and provided them with 50 "dimes" ($10 quantities) of crack cocaine and gave them instructions for distribution. By 1993, Winters was distributing 4.5 ounces of crack cocaine each

13

week until his arrest in 1994. When Winters was released from prison in 1995, he began distributing crack cocaine in quantities from 4.5 to nine ounces on a daily basis until 1997. That year, Michael Riley was released from jail, and began receiving kilograms of cocaine from a source in Chicago. From 1997 to 1999, Winters distributed 15 kilograms of cocaine per month, supplied by Riley. Winters then began having money problems, but continued to distribute cocaine until his arrest in 2001. After Winters' release from prison in summer, 2006, he began associating with Ian Reed and supplied two to three ounces of crack cocaine per day to a new distributor near 5th St. and Clarke. This continued until the drug house was raided by police in November, 2007. Winters then associated with Dawan Howard, but Winters continued to support Michael Riley in prison through drug proceeds.

33. CI-6 related that in the early summer of 1998, CI-6 began purchasing "8-balls" (eighth-ounce quantities) of crack cocaine from Corey Winters, which CI-6 sold in $10 increments in the Westlawn housing projects. As time went by, CI-6 purchased several "8-balls" at a time from Winters, and later 1.5 ounces per transaction. By 1999, CI-6 began to purchase "splits" (4.5 ounce quantities) from Winters, but lost the earnings in underground gambling games, and was forced to purchase smaller quantities of crack cocaine from Winters again. CI-6 then purchased 2.25 ounce quantities of crack cocaine from Winters until CI-6's arrest in October, 1999 for selling cocaine to an undercover officer. CI-6 stated that associates believed that CI-6 was cooperating with law enforcement, and would not buy from or sell to CI-6. CI-6 was a fugitive until August 2000, when CI-6 was apprehended and sent to prison until June, 2007. In late 2007, CI-6 contacted Winters again, and purchased 2.25 ounces of cocaine, which CI-6 then delivered to an associate. Later, CI-6 developed a new supplier, and middled transactions of one-half to 4.5 ounce quantities of cocaine

14

between the supplier and Corey Winters, Willie Mohomes, Aaron Seymore, and others. Eventually, CI-6 purchased directly from the supplier, and converted the cocaine into crack cocaine which CI-6 distributed to Aaron Seymore and other Westlawn members. However, by February, 2008, CI-6 began purchasing one-half to 1.5 ounce quantities of cocaine from Corey Winters again two to three times per week until April, 2008.

34. CI-7 met Corey Winters when CI-7 was approximately 10 years old. CI-7 stated that by 1993, Winters sold crack cocaine on a daily basis, both in Westlawn and in the area of N. 63rd St. and Kaul, which was run at that time by the Courtyard gang. Winters supplied crack cocaine to Lamar Walton, Rufus Cassel, Vernell Bullock and others. CI-7 stated Winters was arrested on a drug charge in 1994, but was released in 1995. Winters then began working with Michael Riley to purchase larger quantities of cocaine. CI-5 stated that Winters would distribute or middle two and then three kilograms of cocaine weekly from June, 1995 until January, 1997. In approximately spring of 1998, CI-7 began working with Winters and Riley in distributing cocaine, which Riley received in 10 to 15 kilogram shipments one to two times a month. CI-7 stated that this arrangement continued until January, 2000. In this time frame, Riley and Winters supplied the Westlawn housing projects and Westlawn members, while CI-7 primarily supplied Six Trey members. Winters was eventually arrested and went to prison until the end of 2006 or the beginning of 2007.

35. CI-7 stated that once Winters was released from prison, he began to receive cocaine again. CI-7 also began to spend time with Winters and Michael Riley, who had been federally indicted and was awaiting sentencing, on a daily basis. Winters then asked Riley if Riley would have his Chicago supplier provide Winters with cocaine, and Riley agreed. Winters further supplied CI-7 with 4.5 ounce quantities of cocaine on several occasions in 2008.

15

36.     CI-9 met Corey Winters in 1998 through a relative, though CI-9 already knew that Winters distributed cocaine.  From April 1998 to November 1999, CI-9 would front 10 to 15 kilograms of cocaine two to three times a month to his relative, who would then supply Winters with cocaine.  In approximately the spring of 2007, CI-9 obtained his relative's permission to supply cocaine directly to Winters.  CI-9 then began supplying one kilogram of cocaine to Winters two times a month for approximately three months before CI-9 lost CI-9's source of supply.

37.     Additional information pertaining to Corey Winters is contained in the following sections herein: *Background Information; Lamar Walton; Michael Riley; Willie Mohomes; Elton Carter; Jeffrey Carter; Dawan Howard; and Ian Reed*.

### Michael Riley

38.     CI-2 met Michael Riley in approximately 1994 or 1995, and eventually became friends with him and accompanied Riley on a regular basis when Riley conducting cocaine transactions in Milwaukee.  Between 2001 and 2004, CI-2 received approximately four kilograms of cocaine from Riley in 4.5 ounce and larger quantities.  CI-2 also supplied Riley with four to five kilograms of cocaine in 4.5 ounce and larger increments in that same time period.  CI-2 further observed Riley in possession of a handgun on numerous occasions.

39.     CI-3 met Michael Riley, a.k.a. "MJ," in elementary school in 1983.  By 1989, Riley received 4.5 ounces of cocaine at a time, three times a week, to distribute in $10 and $20 quantities.  CI-3 added that by the time Riley was 14 and in middle school, he purchased his first car, and sold one to nine ounces of cocaine at a time.  In 1994 or 1995, Riley began receiving kilograms of cocaine from his cousin in Chicago.  At one point, CI-3 went to Riley's mother's residence in the Westlawn housing projects and observed Riley, Corey Winters, and another member cooking approximately

7 kilograms of powder into crack cocaine. CI-3 learned from Winters that Riley received 20 to 30 kilograms of cocaine from his cousin every two months from 1994 to 1998. CI-3 made regular purchases of cocaine and crack cocaine from Riley from 1992 to 2001, in quantities from one to nine ounces. CI-3 stated that Riley was in possession of firearms during drug transactions, and was very security conscious to ensure his safety and to avoid detection by law enforcement.

40. CI-7 met Michael Riley in approximately 1987 in the Westlawn housing projects. When Riley was approximately 12 to 13 years old, Riley began to distribute "crack rocks" and one-sixteenth to one-eighth quantities ounce quantities of crack cocaine. Riley also "worked the door" at various crack cocaine distribution residences inside Westlawn. CI-7 stated that for Riley's age, he had a lot of money, wore gold chains and drove Cadillacs. Over time, Riley began to distribute larger quantities of crack cocaine. In approximately 1993 or 1994, several of the older Westworld gang members were incarcerated, and the younger generation began to refer to themselves as Westlawn. In approximately 1994, CI-7 associated with Riley on a regular basis, and CI-7 would obtain crack cocaine from Riley. From May 1994 until October 1994, CI-7 was "middling" 1.5 to 3 ounces of crack cocaine between Riley and CI-7's customers, 3 to 4 times per month. CI-7 stated that in approximately 1995 or 1996, CI-7 had a conversation with Riley, Corey Winters, and others. CI-7 told these individuals, "We don't talk about each other. We might go to jail. Someone might make it big, but eventually we're all going to die. We don't talk about each other." This agreement was relayed to other Westlawn members, which compelled arrested individuals to turn to outside individuals in order to obtain credit towards their prison sentences.

41. In approximately March to May of 1995, CI-7 was released from jail and began associating with Riley on almost a daily basis. Approximately three to four times each week CI-7

17

received one-half to one ounce quantities of crack cocaine from Riley, until January or February 1996, when Riley became unable to supply the increasing amounts requested by CI-7. Riley and CI-7 then combined their money in order to purchase larger amounts of cocaine, from 1.5 to two kilograms of cocaine and 9 ounce to one-half kilogram quantities of crack cocaine. Riley also began working and distributing cocaine with Corey Winters during this time period. CI-7 stated that Riley and CI-7 had a business understanding between each other, in that Riley and CI-7 would "middle" crack cocaine transactions for each other depending on who had the most crack cocaine at that time.

42.     In approximately March to May of 1998, CI-7 was out of jail and back with Riley again. Riley fronted CI-7 with 9 ounces of powder cocaine and told CI-7 that it was CI-7's coming home present. CI-7 took the cocaine and sold it to Six Trey members, and then began to receive one to 1.5 kilograms of cocaine a week from Riley. If Riley was not around, Winters would provide the cocaine to CI-7. This arrangement went from the spring of 1998 until January 1999. CI-7 then received one-half to one kilogram of cocaine, one to two times each month from Riley from January 1999 to approximately August or September 1999. CI-7 then went to jail, but was released in May, 2000. During the summer of 2000, CI-7 drove with Riley to Chicago. Riley was bringing a bag of money (partial payment) to a supplier for a cocaine shipment that Riley previously received. CI-7 stated that CI-7 received 9 ounces to one-half kilogram of cocaine three times each month from May to approximately September or October of 2000. In later years, Riley admitted to CI-7 that Riley had cooperated with law enforcement in the prosecution of another drug trafficking crew. As Riley was still running Westlawn, no one retaliated against him for cooperating with law enforcement. Riley continued to sell cocaine, but was very careful in his transactions. Ultimately, Riley was arrested in March, 2005 and prosecuted federally for his role in relation to another drug trafficking

organization.

43. Additional information pertaining to Michael Riley is contained in the following sections herein: *Background Information; Lamar Walton; Corey Winters; Elton Carter; Jeffrey Carter; Dawan Howard; Ian Reed; Aaron Seymore; and Robbery and Shooting of Joeveshaun Ward.*

**Willie Mohomes**

44. CI-3 met Willie Mohomes in approximately 1985 or 1986 when Mohomes moved to Westlawn. Mohomes became involved in distributing small amounts of cocaine in 1992 or 1993. By 1998 or 1999, CI-3 supplied Mohomes with half-kilograms of cocaine approximately four times a month until Mohomes went to prison for a robbery in 1999. CI-3 remained in contact with Mohomes during his incarceration, and upon his release in 2007, immediately began distributing cocaine for Corey Winters. Mohomes typically bought two kilograms of cocaine at a time for Winters, one with cash and the other on consignment. In addition, Mohomes began handling Winters' distribution to customers. Later on, Mohomes and Dawan Howard received kilograms of cocaine from members of the Nash Street gang and supplied Aaron Seymore, Jeffrey Carter, and other Westlawn members.

45. CI-5 met Willie Mohomes, a.k.a., "Man," in 1993 while in Westlawn. Mohomes distributed cocaine and crack cocaine of good quality and weight, and gained a good reputation as a drug dealer. CI-5 knew that Corey Winters supplied Mohomes with cocaine, but that Mohomes had other suppliers as well. CI-5 stated that Mohomes was usually provided cocaine on consignment by Winters, and Mohomes cooked the cocaine into crack cocaine. CI-5 estimated that CI-5 received a total of nine ounces of crack cocaine from Mohomes from approximately summer until November, 2007, in half-ounce to ounce quantities. CI-5 related that Mohomes is viewed as a leader in

19

Westlawn.

46.     CI-6 met Willie Mohomes in approximately 1990 or 1991, though CI-6 and Mohomes were never involved in drug transactions together until January, 2008.  At that time, Mohomes complained to CI-6 about the poor quality of cocaine he had purchased from Corey Winters, and asked if CI-6 could supply Mohomes with cocaine.  CI-6 then "middled" a 4.5 ounce cocaine transaction between CI-6's supplier and Mohomes, and continued to provide Mohomes with 2.25 to 4.5 ounce quantities of cocaine twice a week for the next three months, until April, 2008.

47.     CI-8 met Willie Mohomes in 1996, and they quickly became friends.  Mohomes distributed cocaine and crack cocaine in various parts of Milwaukee including the Westlawn housing projects, and also committed armed robberies of other drug traffickers.

48.     On December 17, 2008, City of Milwaukee police detectives and officers executed a search warrant at 66XX N. 55th Street.  On the top shelf of a closet in the master bedroom of the residence, officers recovered a loaded 9mm Glock Model 26 handgun which had been reported stolen in the City of Milwaukee, as well as a loaded Sturm Ruger Model P345 which had been reported stolen in Grand Forks, North Dakota.  Also in the closet, officers found a small black suitcase containing several gallon-size zip-loc bags with marijuana residue, a digital scale, and boxes of plastic bags typically used to package narcotics.  Officers further located $5,000 in U.S. currency from behind a dresser mirror in the bedroom, as well as documents belonging to Willie Mohomes including college registration forms and a photo identification card.  In the kitchen, officers located an appointment card issued by Mohomes' state probation and parole officer.  Mohomes was arrested later at 2XX E. Keefe Street, and as he was escorted to a police vehicle, called out to a relative, "They say they found some guns at my other house."

20

49.     Additional information pertaining to Willie Mohomes is contained in the following sections herein: *Background Information; Corey Winters; Elton Carter; Jeffrey Carter; Dawan Howard; Sam Lipsey; and Ian Reed.*

**Undray Bradley, Kendall Burton, Jeffrey Jones**

Drug Trafficking

50.     CI-3 met Kendall Burton in the late 1980s or early 1990s after Burton came to Milwaukee from Arkansas. Burton originally hung around the Westlawn housing projects, but later moved to N. 63rd St. and began associating with Six Trey members. Burton then began distributing cocaine and marijuana, and conducting robberies with Lamar Walton and Vernell Bullock.

51.     On August 28, 2008, under direction of law enforcement, CI-3 wore a body recorder and met with Kendall Burton and other Six Trey members, and afterward turned the recording over to law enforcement and discussed the meetings. CI-3 stated that Burton picked up CI-3, then drove to Burton's sister's home near 100th St. and Hampton Ave. Burton then retrieved some money from under the front seat, and entered the home. When Burton returned, he placed a quantity of marijuana under the front seat. Burton eventually drove to the Westlawn housing projects, and Burton and CI-3 entered a home in the area of N. 62nd and Birch. There, they met with other Six Trey members, and discussed the "old days," the prices of cocaine and marijuana, and the locations of former associates. At some point, Lamar Walton and Vernell Bullock arrived. Burton advised Walton that Walton would be named in an upcoming federal indictment, and Walton stated that he already knew this would happen. Burton then became upset as Walton had not shared this information with him. After Walton and Bullock left, several members speculated about who would be indicted with Walton.

52.     CI-7 first met Kendall Burton in 1995, and though Burton followed Rufus "Silk"

Cassel at the time, he spent time in the Westlawn housing projects. After being robbed while at Westlawn, Burton began spending time on N. 63rd St. to build a stronger allegiance with and gain protection from Six Trey members. CI-7 and another Six Trey member then began supplying one-eighth to one-quarter ounce quantities, and later one-half to one ounce quantities, of crack cocaine to Burton, who then sold the drug on the street corners. Burton also began working with Vernell Bullock in committing acts of violence. Burton eventually obtained a cocaine and marijuana source of supply in Arkansas, and traveled there monthly to receive up to 500 to 600 pounds of marijuana and one to two kilograms of cocaine each trip. Sometimes, Burton would bring half the marijuana to another distributor in St. Louis, Missouri. Upon returning to Milwaukee, Burton would distribute the cocaine and marijuana to Six Trey members. This arrangement continued from approximately 1998 until Burton was arrested in Illinois later that year. In 2006, after Vernell Bullock was released from prison, Burton distributed small amounts of marijuana, though Burton would ask for ounces of cocaine from CI-7, which CI-7 would not supply. By CI-7's estimation, Burton sold 4 to 5 pounds of marijuana in 2008, and CI-7 sometimes middled transactions of two pound quantities of marijuana for Burton.

53. CI-15 met Jeffrey Jones, a.k.a. "Bump," in approximately 1994 when Jones hung around with Brothers of the Struggle (BOS) members. However, by 1996, Jones stayed in the area of N. 63rd St. Jones began assisting Kendall Burton in drug trafficking, and specifically drove Burton around when Burton distributed marijuana. CI-15 met Undray Bradley in approximately 1989 in the area of N. 63rd St. Bradley worked for Lamar Walton, and would "middle" drug transactions for him. However, Bradley would then use crack cocaine with the customer, and his substance abuse problems made it difficult for Bradley to be successful in drug trafficking.

22

Kidnapping of Phillip Dixon

54.     On August, 20, 2008, CI-3, acting under the direction of law enforcement, wore a body wire and met with Kendall Burton and other Six Trey members.  During the conversation, which began at about 3:00 P.M. that date and was reviewed by law enforcement, Burton discussed the abduction and beating of Phillip Dixon over a $350 drug debt, then getting into a shootout with Dixon's family members. In summary, Burton stated that Dixon owed him $350, and that he approached Dixon in a bar and asked him to step outside.  Burton further related that outside, in the presence of Jeffrey Jones, a.k.a., "Bump," Burton began questioning Dixon.  As Dixon began "talking slick," Burton and Jones pistol-whipped him then threw him in the car and drove him to Westlawn for ransom.  Once there, other Six Trey members were hard on Dixon over the debt, and Burton believed that they might kill him.  Burton stated that Dixon began crying and begging to be let go, and Burton felt sorry for Dixon.  Burton related that he then spoke by phone with members of Dixon's family, who stated that they had Burton's money and that he should come over.  Burton stated that when he met with Dixon's mother at her residence, Dixon's father arrived and asked Burton to step outside.  Burton stated that when he did so, Dixon's whole family was there.  As he followed Dixon's father to the alley, Burton heard two shots, so he pulled out a gun and began firing. Burton then stated that Jones then pulled up and that he (Burton) got in the car while Jones began firing his gun as well.  Burton stated that later, Dixon's father called him trying to squash the matter because he was worried Burton would mess with their family.  Burton stated that Dixon's family finally paid him, and that Dixon called later and apologized.

55.     When asked about the incident with Phillip Dixon, CI-7 stated that CI-7 was meeting with Vernell Bullock in a car near N. 54th St., when Kendall Burton called and asked CI-7 to come

to Westlawn. Burton related to CI-7 that they were beating a subject who owed them money. CI-7 related that Bullock and CI-7 had no intention of meeting Burton, however, as Burton and Bullock had a "rough relationship." CI-7 explained that Burton constantly complained to CI-7 about the degree to which Bullock, as leader of the Six Trey, controlled his activities. An hour or two later, CI-7 received a call from Undray Bradley, who asked CI-7 to pick him up. Bullock and CI-7 then drove to meet Bradley, and observed Bradley speaking with Burton and Jeffrey Jones. Burton, Jones and Bradley then together discussed the abduction and beating of Dixon over a drug debt. In summary, CI-7 related that the group advised CI-7 that they went to get Dixon, and Dixon tried to run. Bradley then grabbed Dixon, and Jones beat him with a pistol. Once Dixon was in the vehicle, they drove around looking for a safe place to beat him, and ultimately decided to go to the Westlawn housing projects. Once there, Dixon was punched, kicked and pistol whipped by Six Trey members. The group added that Dixon's family was contacted, and agreed to pay the money owed. The group then took Dixon out of Westlawn and released him, and went to meet Dixon's family. Upon arrival, Jones and Bradley stayed in the car while Burton met with Dixon's father, who was upset and did not want to pay Burton. CI-7 related that the group advised that Jones and Bradley observed two subjects with guns sneaking up on them, and Jones gave a handgun to Bradley, who began to shoot. The two subjects returned fire, striking the car, and Burton got in and the group drove away.

56. Case agents spoke with Phillip Dixon, who related that in the spring of 2006, he was receiving drugs from Kendall Burton, who was having a difficult time financially as he was not distributing enough to support his lifestyle. Dixon related that because of this, Burton let Dixon keep only a very little money from the drug sales, and so Dixon withheld $300. By October, 2006, Burton became tired of waiting, and called Dixon to tell him he wanted the money and to meet him at

24

Dixon's mother's residence. However, Dixon stated that he instead went to meet a girlfriend at a bar on N. 8th and Ring. Burton and Jeffrey Jones eventually located Dixon, and asked him to come outside. Dixon stated that when he did so, they got into a fight, and Dixon was forced to accompany them while they intended to drive around to various places where Dixon could ask people for money. In the area of N. 23rd and Locust, a third person (later identified as Undray Bradley) entered the vehicle. The group then drove Dixon to his girlfriend's home near 64th St. and Villard, but she didn't have any money. Dixon related that Jones and Bradley then beat him in the alley, and then the group drove him to Westlawn. Eventually, Burton spoke with Dixon's father, who arranged for Dixon's debt to be paid, and Dixon walked to his girlfriend's home, and then went to a hospital to have his arm examined. Enroute to his girlfriend's home, he called his family and explained what happened. Dixon finally related that he later heard that Burton, Jones and Bradley met with his father, who refused to pay due to Dixon's beating. Dixon stated that his cousin began shooting at Burton, and that someone (Burton, Jones or Bradley) shot back, and the group left the residence.

**Elton Carter**

57.     CI-3 met Elton Carter in approximately 1989, and described him as a shooter and an armed robber who occasionally sold drugs. CI-3 added that by 1995, Elton Carter began committing robberies in addition to selling small quantities of drugs, and described several instances when Carter robbed other drug traffickers. CI-3 stated that by 2002 or 2003, Carter and another individual had a cocaine distribution house in the Westlawn housing projects. CI-3 further stated that Michael "MJ" Riley was considered to be "soft" by Westlawn members as Riley was constantly crying about his personal problems. CI-3 stated that it was important to everyone in Westlawn that all members had a strong resolve, otherwise they could be a liability. For this reason, Carter was often sent to

"conduct a beating" on Riley in an attempt to toughen him up.

58.     CI-5 met Elton Carter, a member of the Westlawn street gang, in approximately 1992 or 1993.  CI-5 added that Elton Carter is not related to Jeffrey Carter, another Westlawn gang member.  CI-5 stated that Carter was violent growing up, and by 1995 or 1996 was committing armed robberies for money, and associated with Willie Mohomes, Corey Winters, Michael Riley, Aaron Seymore, and others.  When Carter could not find anyone to steal money from, he would sell crack cocaine.

59.     Additional information pertaining to Elton Carter is contained in the following sections herein: *Franwan Mathis and Shooting and Robbery Joeveshaun Ward*.

### Jeffrey Carter

60.     CI-3 met Jeffrey Carter in 1989, and that Carter associated with Willie Mohomes and several other Westlawn members.  By 1994 or 1995, Michael Riley and another Westlawn member were supplying Jeffrey Carter, Willie Mohomes, Franwan Mathis and others with cocaine.

61.     CI-5 related to case agents that CI-5 first met Jeffrey Carter, a.k.a. "Shawniac" in 1988 or 1989 in Westlawn.  In approximately 1992, Jeffrey Carter began selling $10 quantities of crack cocaine on a regular basis with another Westlawn member.  By 1995 or 1996, Jeffrey Carter was distributing ½ to 1 ounce quantities of crack cocaine with Corey Winters, Michael Riley, and another individual.  In addition, Carter and Winters were conducting robberies and thefts as a means to supplement their income, and Carter typically carried a handgun.  CI-5 added that from 2000 to 2007, Jeffrey Carter continued to receive crack cocaine from Winters, Riley, and others.  In 2006, Carter began running a prostitution ring in Milwaukee, and using these women to hold crack cocaine and guns for him.  That same year, CI-5 associated with Jeffery Carter on a daily basis, and stated

26

that Carter was known as the "Blow Up King" due to his ability to turn 18 ounces of cocaine into 27 ounces of crack cocaine, and for this reason other drug traffickers would pay Carter to cook their cocaine into crack cocaine. CI-5 observed Carter with 3 to 4.5 ounces of crack cocaine on four or five occasions in 2006.

62.     Additional information pertaining to Jeffrey Carter is contained in the following sections herein: *Willie Mohomes; Franwan Mathis; Shooting and Robbery of Joeveshaun Ward*.

**Roderick Davis**

63.     On August 16, 2008, officers and detectives from the City of Milwaukee Police Department investigated an arson at 51XX N. 56th St. The fire was found to have five separate points of origin: the main entrance, the secondary entrance, two points by the kitchen window, and the north side of the garage. Investigators located a 16 ounce juice bottle near the garage containing a liquid that smelled like gasoline, and with minor melting damage at the bottle's lip. Interviews with the homeowner and her 15-year old son indicated that they awoke that morning at approximately 6:00 A.M. to observe smoke and flames at the doors to the residence, forcing them to escape through a first floor bedroom window. While looking for the younger children, the 15-year old observed a subject running from the rear of the residence towards N. 55th Street.

64.     CI-7 advised case agents that the above arson was committed by Vernell Bullock and Roderick Davis over the loss of money on an attempted cocaine transaction. CI-7 related that in July or August, 2008, CI-7 and Bullock were attempting to purchase nine ounces of cocaine from a supplier. In order to conduct the transaction, they had to go through a "middle man," T.W. CI-7 stated that T.W. arrived at Bullock's residence and received $7500 to $8000 from Bullock and CI-7. Later that day, T.W. called CI-7 and stated that the cocaine dealer had taken her money, walked into

an apartment building, then ran out the back door with the money. CI-7 then spoke with Bullock, who stated that T.W. was lying and had stolen their money. Bullock wanted to retaliate, but CI-7 was able to convince Bullock not to harm T.W. Unfortunately, Bullock remained angry, espcially after hearing that T.W. was out spending the "stolen" money. CI-7 stated that Bullock confronted T.W., and asked for a picture of or information about the dealer who stole the money. Eventually, T.W. went to the dealer's mother's home at 51XX N. 56th St. and convinced the mother to help return the money. CI-7 stated that CI-7 and Bullock drove by this residence after contacting T.W. while she was there and observed T.W.'s car parked in front.

65.     CI-7 further related that a few days later, at approximately 3:00 A.M., CI-7 heard a knock on the door and observed Bullock on the door step and Roderick Davis in Bullock's vehicle. CI-7 invited both of them in, and made them sit on the floor because they smelled like gasoline. CI-7 asked what was going on, and Bullock responded they, "burned their house down." Davis then told CI-7 that Davis had a spray bottle containing gasoline, and sprayed the front and side doors, as well as the rear of the residence and a vehicle next to the house. Davis stated that Bullock sat in the car as a lookout while he lit everything on fire, and that they could see the home on fire. Later that day, CI-7 drove by the residence with Bullock and observed the damage.

66.     Regarding this incident, CI-8 stated that Lamar Walton came to CI-8's home one morning and asked for "paper." CI-8 provided Walton with $4500, expecting from past experience that Walton would use the money to purchase cocaine. Several hours later, Walton called CI-8 and asked CI-8 to meet him near N. 32nd and W. St. Paul Ave. Upon arrival, Walton stated that, "them hoes got robbed," elaborating that Walton had given the money to T.W. and another woman, who related to Walton that they in turn gave it to the cocaine dealer, who entered a building at the location

28

and then ran out the back. CI-8 asked if the women ripped them off, and Walton stated that he believed the women's story, as they were in a vehicle in front of the building crying. CI-8 stated that women later informed Walton that they had spoken with the thief's mother. CI-8 and Walton later drove by the thief's mother's residence at 51XX N. 56th St., and Walton wanted to get out and shoot up the residence, but CI-8 convinced Walton otherwise and they drove away.

67.     CI-8 continued that later, CI-8 and Roderick Davis were in the vicinity of the residence, which CI-8 pointed out to Davis. CI-8 told Davis about the robbery, and stated jokingly that they should burn it down. Davis responded "let's do it, we can do it," but CI-8 declined. CI-8 then drove them to CI-8's residence, and Davis went to the trash can outside and grabbed a juice bottle with a spray nozzle on top. Davis then filled the bottle with gasoline from CI-8's father's truck, and they got back in CI-8's vehicle and drove back to N. 56th St. CI-8 stated CI-8 pulled over on N. 55th Street, and Davis exited and approached the residence from 56th Street. Two to three minutes later, Davis returned to CI-8's vehicle, and CI-8 circled around the block and they saw smoke and people standing outside. CI-8 asked Davis what he had done, and Davis replied that he had sprayed gasoline on the residence and a car in the driveway, then lit it and left. CI-8 stated that then drove to Walton's residence, and Walton stated he could smell burnt hair. Davis washed up and explained that he had accidentally splashed some gasoline in his hair, which had burned a bit.

**Durlyn Eddmonds and Jerry Greer**

68.     On September 25, 2007, City of Milwaukee police officers and detectives were dispatched to investigate a shooting at 82XX W. Thurston, Milwaukee, Wisconsin. Upon arrival, they discovered that the victim, M.W., had been shot in the right upper shoulder while seated in a 1998 Chevy Cavalier parked in front of the residence. Six .40 caliber casings were recovered in the

parking lot west of the residence, and the house across the street, 82XX W. Thurston, was found to have been struck multiple times by bullets. Interviews of the victim and several citizens at the scene provided various and at times conflicting accounts of the shooting, though some described an altercation shortly before between the victim and his associates and the building "handyman." None of these persons were able or willing to identify anyone involved in the shooting.

69.     CI-7 advised case agents that CI-7 first met Durlyn Eddmonds, a.k.a., "D.L." in approximately September, 2006, after Vernell Bullock was released from prison. Bullock described Eddmonds and other individuals as new Six Trey recruits. At the time, Bullock was involved in distributing cocaine, heroin and marijuana, and would pass the cocaine on to Eddmonds and others, who would distribute the cocaine and return the proceeds to Bullock. CI-7 stated that Bullock would have Six Trey members distribute drugs during the day, and commit armed robberies at night. CI-7 added that Eddmonds was Bullock's "right hand," and because Eddmonds was such a good earner, Bullock tried to prevent Eddmonds from committing armed robberies unless absolutely necessary. CI-7 advised that in 2007, Six Trey member Jerry Greer, a.k.a. "Little Jerry," distributed cocaine with another member, from an apartment in Carmen Court.

70.     Regarding the shooting in September, 2007, CI-7 advised that Bullock called CI-7 and asked CI-7 to meet him at Durlyn Eddmonds' residence on N. 61st Street in Milwaukee. At that location, CI-7 met with Bullock, Eddmonds, Greer, and other Six Trey members. Bullock told the group that an individual had threatened his mother over a vehicle that was vandalized near her residence, an apartment building on Thurston. Bullock then told the members, "One of you has to go take care of that." Eddmonds advised that there was a Glock in the house, and Greer volunteered, "I'm strapped, I'll go." Bullock then received a phone call advising that the subject making the

Case 2:09-cr-00254-CNC   Filed 10/19/09   Page 30 of 49   Document 2

threats was outside Bullock's mother's building. CI-7 then followed Bullock, Eddmonds and Greer as they drove to the area of N. 83rd and Carmen (a location known by case agents to be in the area of 82XX W. Thurston). Bullock stopped the vehicle around the corner from the apartment building, and Eddmonds and Greer exited the car and approached the front of the apartment building from the back yard. CI-7 was driving in the area, and then heard gunshots. Shortly thereafter, CI-7 met up with Bullock, and Eddmonds and Greer exited Bullock's car and entered CI-7's car. Eddmonds and Greer then advised CI-7 that they approached two subjects, one standing and one sitting in a car parked in front of the building, and began shooting from approximately 10 feet away. CI-7 then dropped Eddmonds and Greer off on N. 61st Street.

71.      CI-8 advised that regarding the shooting incident, CI-8 recalled that while driving, CI-8 received a phone call from CI-8's mother stating that she had been threatened by several men in the neighborhood after they were told to stop working on vehicles behind CI-8's mother's building. CI-8 proceeded to Durlyn Eddmonds' residence on N. 61st Street, and advised Eddmonds that CI-8 was going to head over to his mother's residence. At about this time, Jeffrey Greer and two other Six Trey members drove by, and CI-8 told them what happened. Eddmonds, Greer and the others agreed to accompany CI-8. CI-8 asked Greer for a gun, but Greer stated that he would bring a gun along himself. The group then drove to CI-8's mother's residence near N. 83rd and Carmen, and observed 9-10 subjects outside the building. CI-8 advised the group that these individuals threatened CI-8's mother, and Greer asked, "Who's going?" Greer and Eddmonds then exited the car as they had weapons, but CI-8 remained as he lacked a gun. Greer and Eddmonds then approached the front of the building from the backyard and rear parking lot, and shortly thereafter, CI-8 heard multiple gunshots. Greer and Eddmonds then came running back to the vehicle -

31

Eddmonds carrying a revolver, and Greer carrying a revolver and a semi-automatic handgun. CI-8 heard additional gunshots, and realized that the individuals in front of the home were returning fire. Enroute to W. Bender and N. 84th St., Greer told CI-8, "you didn't tell us them niggas were strapped," and CI-8 replied that he himself was unaware the subjects were armed. The group then met with Lamar Walton, and Greer and Eddmonds left the area with him.

72.     CI-8 later advised agents that the landlord at CI-8's mother's apartment building at 82XX W. Thurston was a cocaine user and had been allowing individuals to distribute cocaine out of the building. CI-8 added that the subjects who hung around near the residence, including the victim of the shooting, M.W., knew that CI-8 and his associates distributed drugs, and would rob drug dealers in order to sell the drugs themselves. CI-8 stated that the group had already broken into the residence of one Six Trey member, who used his apartment at 82XX W. Thurston to distribute drugs, but had not located any drugs. The group, who also stole cars, then threatened CI-8 and CI-8's mother over damage to a stolen vehicle. CI-8 stated the group had to be confronted to prevent further interference with CI-8's drug trafficking at that location.

**Dawan Howard**

73.     CI-3 has known Dawan Howard since they were kids, and first observed Howard selling "dime bag" quantities of crack cocaine in the Westlawn Housing Projects in 1994 or 1995. By 1998, Howard was distributing half-kilogram to kilogram quantities of cocaine with Michael Riley on a weekly basis. CI-3 stated that when Riley left town, he left cocaine and his cell phone with Howard, so that Howard could continue to distribute to Riley's customers and return the proceeds to Riley. Howard also had this arrangement with Corey Winters. CI-3 further knew that Howard was arrested in 2000 for selling cocaine for Riley, and because Riley didn't cooperate with

32

police, Riley supported Howard while he was incarcerated. CI-3 added that Howard was released from prison in 2006 or 2007. In July, 2008, CI-3 was with Willie Mohomes at the residence of another Westlawn member, when Howard arrived with a zip lock bag containing approximately 130 grams of cocaine. This cocaine was then cooked into crack cocaine by this member, and distributed to customers who arrived at the residence while Howard and others smoked marijuana.

74.     In August, 2008, Howard was arrested for Delivery of Cocaine in Milwaukee case number 2008CF004070. In that case, Howard sold $60 worth of crack cocaine to an undercover police officer. CI-3 subsequently related to case agents that a number of Westlawn members were concerned that Howard might be cooperating with law enforcement. CI-3 was subsequently fitted with a recording device, and met with Willie Mohomes and another Westlawn member. During the conversation, Mohomes discussed the fact that Howard had been receiving kilograms of cocaine, and had previously avoided indictment when some of his suppliers were charged federally. By September, 2008, Mohomes advised CI-3 that he would be unable to trust Howard anymore.

75.     CI-5 advised case agents that CI-5 first met Howard after he was released from jail in 1990 or 1991 in the Westlawn Housing Projects. Howard later moved to Westlawn, and began selling marijuana, then cocaine, and ultimately crack cocaine with Michael Riley, Corey Winters, and others. CI-5 stated that in approximately 1999, Howard was arrested with 4.5 ounces of cocaine that originally belonged to Michael Riley. Riley later provided Howard with $2500 and sent him out of Milwaukee to hide, but Howard ultimately returned and went to prison until the summer of 2007. Upon his return, Howard began distributing cocaine again with Corey Winters and Ian Reed. CI-5 stated that Howard sold both cocaine and crack cocaine, would work with various members of Westlawn to distribute the drugs, and stored them at his cousin's home near the airport.

33

76.     Pursuant to a consensual wiretap order, case agents recorded several calls between CI-3 and Dawan Howard and other Westlawn members in July and August, 2008.  In one of the calls, on  July 28, 2008, 3:12 P.M., CI-3 asked Howard if he had some of that "good" (cocaine) and Howard replied, "Hell nall" but advised that another Westlawn member did.  Howard asked what CI-3 had to spend, and CI-3 replied, "400."  Howard wanted to know what CI-3 wanted, and CI-3 replied he wanted "weed" or something, anything.  Howard advised CI-3 to call Willie Mohomes. In other calls from August, 2008, Westlawn members discussed receiving cocaine from Howard and Howard's arrest in August, 2008.

77.     Additional information pertaining to Dawan Howard is contained in the following sections herein: *Corey Winters; Willie Mohomes; and Sam Lipsey*.

**Sam Lipsey**

78.     CI-3 advised case agents that Samuel Lipsey was an active member of the Westlawn gang, and under the direction of law enforcement, met and spoke with Lipsey on numerous occasions beginning in the summer of 2008.  Many of these meetings and telephone calls were recorded.

79.     CI-3 advised agents that on July 12, 2008, CI-3 met with Lipsey, Willie Mohomes, Dawan Howard, and other Westlawn members while they went to several nightclubs.  The next day, CI-3 accompanied Lipsey and Lipsey's cousin when they went to a dealership where Lipsey's cousin wanted to buy a car.  Once there, Lipsey called Mohomes and ordered two pounds of marijuana to be delivered to the dealership.  Mohomes arrived and conducted the transaction inside his vehicle. Later, Lipsey, his cousin, and CI-3 drove to Lipsey's residence in the 2600 block of N. Hubbard, where Lipsey took the marijuana inside.  Shortly afterward, Lipsey sold some of the marijuana to a woman who parked outside the residence.  CI-3 added that a few days later, Lipsey came to CI-3's

34

residence and showed CI-3 a kilogram of cocaine, which he said was of very poor quality, and was not selling well. CI-3 stated that later that day, CI-3 heard Lipsey on his cell phone complaining several times to his supplier about the quality of the cocaine.

80.     On August 13, 2008, CI-3 was with Lipsey as they walked back to CI-3's home from a gas station. Enroute, Lipsey received a call from a customer seeking crack cocaine. Lipsey then walked to his vehicle and obtained a half-ounce of crack cocaine, then walked back to the station to conduct the transaction. CI-3 then met briefly with law enforcement and was fitted with a body recorder. Back at CI-3's residence, CI-3 met with Lipsey and Willie Mohomes. During the conversation, Lipsey received another call from a crack cocaine customer, but did not leave. Mohomes complained to CI-3 and Lipsey that he was scared about the arrest of Dawan Howard, and believed that Six Trey and Westlawn members would soon face federal indictment.

81.     On August 15, 2008, while wearing a body recorder, CI-3 met Lipsey and CI-3's residence. CI-3 asked Lipsey if he had any cocaine, and Lipsey replied that he had less than an ounce available, and that it was of poor quality. CI-3 then accompanied Lipsey as he sold a half-ounce of cocaine to a customer. CI-3 later advised case agents that Lipsey used a residence near 74th St. and Hampton Ave. to distribute cocaine and marijuana. In a recorded telephone call that date, Lipsey advised CI-3 that he was going to purchase a .40 caliber handgun and 30-round clip for $450, and that he was looking at a .357 handgun and ammunition. On August 18, 2008, in another recorded call, Lipsey advised that he provided "Country," the seller of the guns, with two "hoopers" (3.5 gram quantities of cocaine) and received a .40 Glock and two 30-round clips. CI-3 later advised agents that Lipsey had showed him the .357 handgun he purchased from "Country" on August 16, 2008.

82.     On September 3, 2008, under the direction of law enforcement, CI-3 conducted a

35

controlled purchase of one-half ounce of cocaine from Lipsey at CI-3's residence. The calls to set up the transaction were recorded. The cocaine was later found to consist of 7.06 grams of powder cocaine and 6.95 grams of crack cocaine.

83.     On September 4, 2008, again under the direction of law enforcement, CI-3 contacted Lipsey for an ounce of cocaine which CI-3 represented was for an individual traveling to Milwaukee. Lipsey then provided CI-3 with an ounce of alleged cocaine, and CI-3 paid Lipsey $850. However, when the cocaine was later examined by case agents, it was discovered to be a non-narcotic. CI-3 then called Lipsey to complain, and Lipsey advised that he didn't give refunds. Telephone calls between CI-3 and Lipsey before and after the transaction were recorded.

84.     On September 5, 2008, in a series of recorded telephone calls, CI-3 discussed the possible sale by Lipsey of cocaine, ecstasy and heroin to CI-3. Lipsey ultimately sold CI-3 heroin, resulting in a criminal case in Milwaukee County against Lipsey and another individual for heroin distribution.

85.     On September 9, 2008, while in the presence of case agents, CI-3 received a recorded telephone call from Lipsey, who stated he believed that CI-3 worked for law enforcement, and that if so, there would be consequences. Later, on September 10, 2008, CI-3 advised case agents that on September 9, 2008, CI-3 met with Willie Mohomes and another Westlawn member. During the conversation, Mohomes stated he had spoken with Samuel Lipsey, and that because of CI-3's past cooperation with law enforcement, CI-3's was believed to be presently doing so, even if it was not the truth. Mohomes and the other member stated that because people were saying CI-3 was cooperating against the Westlawn and Six Trey gangs, they would continue to socialize with CI-3, but would not supply CI-3 with narcotics.

36

86.     CI-3 advised case agents that beginning in late October, 2008, Lipsey began contacting CI-3 again, and stated that despite his concerns that CI-3 was an informant, Lipsey wanted to be friends with CI-3 again.

**Franwan Mathis**

87.     CI-3 stated that in 1994 or 1995, Franwan Mathis was being supplied with cocaine by Willie Mohomes and another subject.  CI-3 added that almost all of the armed robberies, shootings and other acts of violence associated with Westlawn members can be attributed to a few individuals, including Mathis, Elton Carter, Jeffrey Carter and others.  CI-3 described some of these incidents to case agents.

88.     CI-5 advised case agents that CI-5 met Franwan Mathis in 1992 or 1993, when he and his family resided in Westlawn, though has not seen Mathis since he went to jail in 2007.  CI-5 stated that Mathis was known as the "muscle" of Westlawn, and was typically called upon to commit acts of violence for other members.  CI-5 further stated that by 1998, Mathis was selling "dimes" ($10 quantities) of crack cocaine and marijuana in the Westlawn housing projects.  CI-5 also knew Mathis to commit robberies.

89.     CI-16 advised case agents that CI-16 first met Franwan Mathis in January, 2007, while they were both incarcerated at the Milwaukee County Jail.  CI-16 and Mathis eventually discussed drug trafficking in the Milwaukee area, and Mathis complained about the purity of cocaine when it reached Milwaukee, stating that drug traffickers would mix in other substances to increase the quantity, but decrease the quality.  CI-16 advised Mathis that although the cocaine in Milwaukee was about 10% pure, CI-16 could obtain cocaine from southern states which was about 70% pure.  Mathis became excited about the prospect of obtaining cocaine of that quality, and asked CI-16 to

37

arrange for Mathis' purchase of 10 kilograms of cocaine. CI-16 quoted Mathis a price of approximately $17,000 per kilogram. Mathis further described how he would use a three-vehicle convoy for the trip: the lead car would be the "scout" car, the second vehicle would be a rental car containing the cocaine, and the third vehicle would be the "security" car and contain subjects with firearms. Mathis further advised CI-16 that he wanted the transaction to occur in a public place, and that he and his brothers all "hang" in the Westlawn housing projects, and have violent reputations. Mathis also bragged about distributing larger amounts of cocaine, and being able to obtain any firearms he needed.

90. Additional information pertaining to Franwan Mathis is contained in the following sections herein: *Jeffrey Carter and Shooting and Robbery of Joeveshaun Ward*.

**Ian Reed**

91. CI-1 related to case agents that CI-1 first met Ian Reed in 1995 or 1996 through Lamar Walton or Corey Winters. At that time, Reed was selling user quantities of crack cocaine and marijuana from a residence in the Westlawn Housing Projects, and was supplied by Winters, Walton, Michael Riley, and others. From 1998 to 2000, CI-1 observed Reed with Walton on a number of occasions. CI-1 recalled a particular incident where CI-1 met Walton at the home of Reed's mother. CI-1 observed Reed cooking a half-kilogram of cocaine into crack cocaine, which Reed advised came from Michael Riley.

92. CI-3 advised case agents that CI-3 has known Ian Reed since the 1980s when they were both in elementary school. CI-3 stated that in 1992-93, Ian Reed was selling "dime bags" (0.1 gram quantities) and "8-balls" (3.5 gram quantities) of crack cocaine in the Westlawn Housing Projects, and was supplied by Lamar Walton. Over the years, Reed sold greater quantities of

38

cocaine, and by 1998 was distributing 9 ounce to multi-kilogram quantities in the Milwaukee area. CI-3 stated that CI-3 accompanied Reed at least a dozen times during these deliveries, and usually rewarded CI-3 with 9 ounces of cocaine. CI-3 further observed Reed sell another Westlawn member two to three ounces of cocaine very other day from 2002 to 2003. CI-3 related that Reed often carried a handgun when distributing cocaine, and recounted an incident in 1995 or 1996 when a cocaine customer attempted to rob Reed, and Reed pulled out a handgun and fired multiple times into the customer's vehicle. CI-3 also knew of other instances when Reed possessed a handgun. CI-3 further stated that when CI-3 was released from prison in July, 2008, CI-3 was with Lamar Walton and Vernell Bullock when they met several other Westlawn members, including Willie Mohomes and Ian Reed. The next day, Mohomes picked up CI-3 and drove to meet Reed in the Westlawn Housing Projects. Mohomes then supplied Reed with two pounds of marijuana, and Reed entered a residence with the marijuana, and returned a short time later with currency wrapped in rubber bands, which Reed gave to Mohomes.

93.      CI-5 related that Ian Reed hangs around the Westlawn area on a daily basis. CI-5 related that Reed became close to Michael Riley by 1992, but had spent more time with Lamar Walton by 1997. Reed and Walton shared drug customers and cooperated with each other in the distribution of cocaine and marijuana. CI-5 had previously seen Reed with up to 50 pounds of marijuana at a time, and in possession of 3 kilograms of cocaine in 1998. In the summer of 2007, CI-5 observed Reed with 2.25 ounces of crack cocaine and two to three pounds of marijuana on at least four to five occasions. CI-5 stated that Reed stores drugs at his girlfriend's residence on 12th Street, and wears expensive jewelry and drives nice vehicles.

94.      CI-7 related that in approximately 1997, Michael Riley was being supplied with 10

39

to 15 kilograms of cocaine at a time from his cousin, and that Riley distributed the cocaine with the help of Ian Reed and other individuals. In 2005, Riley was arrested for cocaine possession, and CI-7 related that Riley and Reed subsequently met with Riley's cousin to discuss Riley obtaining credit toward his sentencing by setting up another individual to be arrested with cocaine. At the meeting, Riley's cousin chastised Riley as Riley's cousin and this individual were close friends.

95. Additional information pertaining to Ian Reed is contained in the following sections herein: *Lamar Walton; Corey Winters; and Dawan Howard*.

**Aaron Seymore**

96. CI-3 met Aaron Seymore while in elementary school in the 1980s. CI-3 added that Seymore had been involved in cocaine distribution with Corey Winters and Michael Riley since the early 1990's. From the early 1990s until 1996, Seymore purchased 4.5 ounce quantities of cocaine from Winters and Riley, which he sold as crack cocaine in $10-$20 quantities (0.1 to 0.2 grams) from residences in the Westlawn housing projects, selling up to 9 to 13.5 ounces per day. Over time, Seymore became such a reliable customer that Winters and Riley trusted him to stash kilograms of cocaine and distribute ounce or higher quantities for them when they went out of town. CI-3 stated that except for these occasions, Seymore strictly distributed user-quantities of cocaine in the Westlawn housing projects. In 1998, CI-3 observed Seymore with two one-half kilogram quantities of cocaine which he was selling in $10 to $20 quantities, and a separate kilogram of cocaine he was "middling" for Riley. CI-3 has also seen Seymore with up to $18,000 in drug proceeds. CI-3 stated that Seymore sold small quantities of crack cocaine through 2004. CI-3 believes that Seymore currently receives cocaine from Willie Mohomes, who in turn receives it from Corey Winters.

97. CI-5 met Aaron Seymore in 1990 or 1991 in the Westlawn housing projects. Seymore

began distributing crack cocaine in 1992, and was supplied by Phillip Jones, Corey Winters and Michael Riley. As his suppliers became more successful, Seymore sold larger quantities of crack cocaine. CI-5 further related that unlike other dealers in Westlawn, Seymore would never leave Westlawn to conduct a transaction, and only sold $10 and $20 quantities. CI-5 stated that Seymore used to work with Phillip Jones on a daily basis until Jones went to prison in 2007, but is otherwise somewhat of a loner. Seymore further kept crack cocaine at the residences of various girlfriends, and used rental cars for distribution. Seymore further possessed a handgun during drug transactions, and CI-5 knew him to possess a .357 revolver and a 9mm handgun.

98. CI-7 met Aaron Seymore in the Westlawn housing projects when they were approximately 10 years old. Seymore was already a close associate of Michael Riley, and this continued through 1998, when Riley was in possession of kilograms of cocaine. CI-7 learned from Riley that he was supplying Seymore with multiple ounces of cocaine. CI-5 related that Seymore would never leave Westlawn to conduct a drug transaction, and had more drug distribution houses in Westlawn than any other distributor. When Riley left town, he would leave cocaine with Seymore to distribute for him. Riley was Seymore's primary supplier, though as time passed, Seymore also received cocaine from Corey Winters. By 2001, Winters and another member supplied a majority of the cocaine to the Westlawn housing projects, and Seymore continued to sell out of his drug houses. Jones continued supplying Seymore through 2006, when Jones was arrested for possession of cocaine. Although Jones acted as if he was cooperating with law enforcement, he continued to supply Seymore with cocaine from sources not disclosed to investigators.

99. Additional information pertaining to Aaron Seymore is contained in the following sections herein: Corey Winters; Willie Mohomes; and Elton Carter.

41

**Robbery and Shooting of Joeveshaun Ward**

100.    Case agents separately debriefed CI-3, CI-7 and CI-8 regarding the reasons and procedures behind robberies of drug traffickers by other drug traffickers. These informants explained that the robbery of a drug trafficker was an easy way to gain thousands of dollars in proceeds to purchase firearms, and controlled substances. Moreover, drug traffickers in Milwaukee often associate with each other, even if they do not work with each other to distribute controlled substances. As the traffickers do not want to draw the attention of law enforcement by gambling in legitimate establishments, they typically gamble with other drug traffickers at various undisclosed and private locations. An "inside person," typically another drug trafficker, at the gambling session can therefore contact other drug traffickers, and identify where the session is located, who is present, and who has money, jewelry, and handguns. The gambling session can then be robbed by the drug traffickers or established armed robbers working with the traffickers. Afterwards, the proceeds are split by the drug traffickers, the robbers, and the "inside person."

101.    On April 1, 2004, City of Milwaukee police officers and detectives responded to a shooting at 79XX W. Congress St. Apt. #5. Upon arrival, they located the victim, Joevashaun Ward, who was lying partly in the hallway and partly in the bathroom with a gunshot wound to his lower back. Ward was transported to Froedert Hospital, where it was learned that a bullet had struck the spleen and kidney, and severed the spinal cord, paralyzing Ward from the waist down. Ward was interviewed at the hospital the next day. Ward explained that on April 1, he and his brother went to Elton Carter's apartment on Congress, where at least eight people were present and gambling was occurring in the living room between Michael Riley and another subject. While there, Elton Carter stated that he heard someone coming up the steps. Suddenly the apartment door opened and shots

42

rang out. Ward stated that Elton Carter ran to the bathroom and laid down in the tub, and that Ward followed and laid on top of Carter. Ward then heard several shots through the bathroom door, and a subject state, "Don't move nigger, I'll kill you." Ward was then ordered out of the tub and told to lie on the bathroom floor. A subject then took $60 from Ward's right hand and $2000 from his right front pants pocket, which Ward claimed was from his girlfriend for the mortgage, car note, and property taxes. Ward then heard 2-3 more shots, and was struck. Elton Carter and another perons then called the police. Two other individuals interviewed corroborated Ward's account of the robbery. None of the individuals could identify any of the actors involved.

102. On April 2, 2004, Elton Carter was interviewed by an MPD detective. Carter related that earlier that evening, he, Joevashaun Ward and several others went out to dinner to celebrate a birthday, and afterward Carter invited the group back to his home to gamble. Carter stated that everyone then began to gamble, and during the session, another person called Franwan Mathis so that he could join the gambling session. Carter stated that he later heard knocking at the rear door, and let Mathis inside. Mathis played a couple rounds of craps, but lost about $800. Carter stated that Mathis then advised that he was about to "make a run," meaning get more money, but would return. Approximately 10 to 15 minutes later, Carter heard a footsteps at the rear door. Carter related he looked outside and saw two black males dressed in black and wearing ski masks outside apartment #7. Carter stated he became scared and shut the door, and then heard gunshots. Carter related he ran to the bathroom and hid in the rub, and that Joevashaun Ward followed and laid on top of him. Carter then heard additional gunshots, and a suspect enter the bathroom and state, "this nigger got dust," meaning the person had money. Ward was then pulled off Carter and told to lie on the floor, and asked, "bitch ass nigger, where is the money at." Carter then heard a suspect state, "bitch ass

43

nigger, where the rest at," at which point the suspect shot Ward as he lay on the floor. After the suspects left, Carter stated Ward told him that he was shot and couldn't feel his legs. Carter stated that he recognized the individual who shot Ward as Jeffrey Carter based upon his voice and the handgun he used. Carter also identified another suspect as H.Y. based upon his voice, and stated that he believed it was suspicious that Franwan Mathis left the gambling session just before this incident.

103.    CI-3 stated that regarding the robbery and shooting of Ward, several individuals were gambling at Elton Carter's residence including Carter, Ward, and Michael Riley. During the gambling, Riley lost a lot of money and became angry. Riley then went to the bathroom and called Jeffrey Carter, and told him where they were gambling and who was present. Riley told Jeffrey Carter to rob everyone in the house and that Riley would help Jeffrey Carter gain entry, but wanted his lost gambling proceeds returned. Riley eventually exited the restroom and gambled for a short period of time before he announced that he was out of money and was going to leave to obtain more money. Riley exited the residence, left the door unlocked and ajar, then entered his vehicle and observed Jeffrey Carter and others, all masked, at the side of the residence. Riley then called Elton Carter's cellular telephone and told Elton Carter that there were some unknown individuals observed on the side of Elton Carter's residence. Elton Carter ran to the front door of the residence and attempted to slam the door shut prior to the robbers entering. However, Jeffrey Carter kicked the door open and started shooting. Ward ran into the bathroom, and Jeffrey Carter gave chase and shot Ward in the back resulting in Ward becoming paralyzed. The robbers then took all of the money and the jewelry from the individuals inside the residence, and quickly departed. After the robbery several members of Westlawn were upset that Ward was paralyzed. Riley eventually met with Jeffrey Carter and obtained the jewelry that was taken from another individual. Riley then returned the jewelry,

44

and everyone in Westlawn then knew that Riley was involved in the robbery. CI-3 later had a conversation with Jeffrey Carter, and asked what happened to Ward. At first Jeffrey Carter denied being apart of the shooting, but eventually stated that he felt bad about shooting Ward. Jeffrey Carter stated that when he chased Ward into the bathroom, his finger was on the trigger of the handgun, then lost his footing, and "tensed up" in order to gain his balance. The handgun fired and the bullet struck Ward in the back. Jeffrey Carter told CI-3 that he didn't mean to shoot Ward, and that it was an accident. CI-3 stated that Jeffrey Carter was sincere in his account of the event, and CI-3 believed that Jeffrey Carter was truthful. CI-3 later learned that Franwan Mathis was one of the other masked robbers accompanying Jeffrey Carter.

104.    CI-7 advised case agents that soon after being informed of the shooting, CI-7 contacted Michael Riley by telephone, and Riley told CI-7 that "Fran" (Franwan Mathis) and others robbed "a gamble" involving Ward and others and that Ward was shot during the incident. Riley further told CI-7 that he had nothing to do with the robbery and shooting, and that he (Riley) was angry with Mathis for the shooting. After CI-7 was released from jail in March, 2006, CI-7 met with Jeffrey Carter and asked Carter for money because CI-7 had no means of support so soon after being released from jail. CI-7 stated s/he also asked Carter about the shooting of Ward. Jeffrey Carter told CI-7 that he took part in the robbery and shooting of Ward with Franwan Mathis. Specifically, Jeffrey Carter stated Riley had called and given Mathis the information so Mathis could execute the robbery. Carter further stated that he and Mathis "popped that nigga," and laughed and joked when discussing the shooting with CI-7. A few days later, CI-7 was riding in a vehicle with Riley and Riley told CI-7 that, prior to the shooting, Joevashaun Ward had pulled up to Riley in a vehicle, flashed a large roll of money, and challenged Riley to come and gamble against Ward. Riley told

CI-7 he couldn't back down from the challenge, and they agreed to meet at Elton Carter's house. Riley told CI-7 that Ward beat Riley and won a large sum of money, which angered him, so he called Mathis, and told him his location and that Ward had a large amount of money in his possession. Riley stated Mathis then went and robbed Ward, who was shot in the process. Riley also told CI-7 that "I didn't know them boys were going to shoot him." CI-7 stated, in later conversations with Riley, Riley tried to recant his involvement in Ward's robbery and shooting.

105. CI-12 advised case agents that regarding the shooting, Elton Carter, Michael Riley, Joevashaun Ward and others were gambling at Elton Carter's residence. Ward won approximately $800 from Riley, and Riley stated he was going to call "Westlawn Phil" (Phillip Jones) and have him bring more money. CI-12 knew this to be a lie because Phillip Jones and Elton Carter did not like one another at that time. Soon after the telephone call, Franwan Mathis arrived at Elton Carter's residence. CI-12 stated Mathis took out approximately $100 to gamble, but lost his money quickly, and decided to leave, possibly with Riley. A few minutes later, Elton Carter asked "did you hear that noise" in the hallway outside the apartment. CI-12 stated, with the music playing loudly, they couldn't really hear anything in the hallway. Elton Carter then unlocked the front door and looked into the hallway, then quickly shut the door, exclaimed something, shut off the lights to the apartment, and began running to the rear of the apartment. CI-12 and the others knew something was wrong and began to run and attempt to hide in the apartment, and heard several gunshots. CI-12 ran into the bathroom with Ward and another, who got into the tub together. CI-12 then heard Mathis walking through the apartment calling out. CI-12 stated the robbers were wearing dark colored clothing and masks, and that they came into the bathroom. The robbers frisked Joevashaun Ward and were surprised at how much money he had on him, approximately $2800. CI-12 then heard

46

Jeffrey Carter, whom he'd known for 4 to 5 years, say "He got bank on him" (meaning Ward had a lot of money on his person). Jeffrey Carter then shot Ward and left. CI-12 stated Elton Carter later told CI-12 that Jeffrey Carter was "the shooter." CI-12 stated three individual were present during the robbery and shooting: Franwan Mathis, H.Y., and Jeffrey Carter.

106.     Regarding the shooting of Joevashaun Ward, CI-13 stated that CI-13 was with Michael "MJ" Riley immediately after the shooting, and Riley told CI-13 the events that led to the robbery and shooting of Ward. Riley stated that he was in the apartment playing 4-5-6 (a dice game) and was gambling with several other individuals. Riley told CI-13, that when Riley was rolling the dice there was approximately $1000 in the "bank" (available to be won). Riley rolled the dice and won, but other gamblers stated that Riley improperly rolled. Riley was not closely associated to the other gamblers, who included Ward, so Riley was outnumbered and told to give up the money. Riley became upset, and called Jeffrey Carter, and told him to come and "strip" (conduct a robbery) on the gamblers in the house. Riley then departed the apartment prior to Carter arriving, and left the front door to the apartment building ajar and unlocked. Jeffrey Carter then arrived with other robbers, and followed "Pig" (Joevashaun Ward) into the bathroom and shot him. Riley told CI-13 that during that time, Ward was having sexual relations with Carter's girlfriend, so Riley believed Carter targeted Ward, but also robbed everyone in the residence of money and jewelry. CI-13 stated that after the shooting, Riley received numerous telephone calls from the gamblers who accused Riley of setting up the robbery. Riley told the callers that he could possibly get the jewelry returned to the gamblers by not the money. Riley told CI-13 that he instructed Carter to conduct the robbery to get his money returned, but not to shoot anyone. Riley told CI-13 that Carter just did what Carter wanted to do.

107.     CI-22 advised case agents that CI-22 arrived at the Thompson Correctional Center

47

(TCC) in approximately April, 2008, and was released in approximately February 2009. CI-22 stated "EC" (Elton Carter) arrived at TCC approximately 1-2 months after CI-22. CI-22 stated s/he did not know Carter prior to their incarceration together, but at one point Elton Carter asked CI-22 if CI-22 had a twin brother. After a brief conversation, Carter stated that prior to his incarceration, he had "got into it" with CI-22's brother over a girl. As CI-22 didn't know Carter, CI-22 didn't say much at the time. In approximately October or November of 2008, Precious Ward was sentenced to 29 years in prison for murder, and CI-22 spoke about the sentence with a number of individuals because CI-22 and Precious Ward are cousins. CI-22 stated Carter overheard one of those conversations, and realized Joevashaun Ward, Precious Ward and CI-22 were cousins. Elton Carter then became angry, and stated "Pig (Joevashaun Ward) supposed to be dead" and that he was lucky to be alive. CI-22 then became angry and accused Carter of being involved in the shooting. Carter then admitted to CI-22 to being involved in the shooting, saying that "my niggas were happy that I set it up." Carter continued that Ward deserved the shooting because Ward cooperated with law enforcement in getting another person locked up and that Precious Ward got another Westlawn member locked up. Carter continued to brag about his involvement in Ward's shooting, but CI-22 refused to fight Carter because CI-22 was nearing his release date. Case agents confirmed that CI-22 was at Thompson Correctional Center from April 9, 2008 until February 3, 2009, while Carter was at TCC from July 25, 2008 until December 28, 2008.

The government further reserves the right to supplement the facts herein with additional information at arraignment and bond hearings in this case.

Dated at Milwaukee, Wisconsin this 19th day of October, 2009.

Respectfully Submitted,

48

MICHELLE L. JACOBS
United States Attorney

By:     /s/ Brian J. Resler

BRIAN J. RESLER
Assistant United States Attorney
State Bar Number: 1023837
Attorney for Plaintiff
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin   53202
Telephone: (414) 297-1727
Fax: (414) 297-1738
E-Mail: brian.resler@usdoj.gov